IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OKLAHOMA

| | |
|---|---|
| NATIONAL COALITION OF LATINO CLERGY, INC; CONLAMIC-OKLAHOMA; CHURCH EFICAZ; CHURCH PIEDRA ANGULAR; T-MAC CONSTRUCTION, INC.; CHILINO'S RESTAURANT; JOHN DOE ONE; JOHN DOE TWO; JOHN DOE THREE; JOHN DOE FOUR; JOHN DOE FIVE; JOHN DOE SIX; JOHN DOE SEVEN; JANE DOE ONE; JANE DOE TWO; JANE DOE THREE; JANE DOE FOUR; JANE DOE FIVE, et al.<br><br>Plaintiffs,<br><br>v.<br><br>BRAD HENRY, Governor of the State of Oklahoma, and DREW EDMONDSON, Attorney General of the State of Oklahoma.<br><br>Defendants. | Case No. 07-CV-613-JHP |

### ORDER AND OPINION

Before the Court are Defendants' Motion to Dismiss First Amended Complaint [Docket No. 35]; Plaintiffs' Response in Opposition to the Motion [Docket No. 36]; and Defendants' Reply to the Response. [Docket No. 37]. For the reasons set forth below, the Motion is GRANTED.

### BACKGROUND

**A. Factual Background**

On May 1, 2007, the Oklahoma Legislature passed the Oklahoma Taxpayer and Citizen Protection Act of 2007 ("the Act").[1] On May 8, 2007, Oklahoma Governor Brad Henry signed the

---

[1] The Act is also referred to by some as "House Bill 1804" or "HB 1804".

1

Act into law, with a significant portion of the Act to become effective on November 1, 2007. The Legislature apparently intended for the Act to combat the perceived illegal immigration problems faced by the state of Oklahoma.

The Act is made up of fourteen distinct sections, eleven of which are substantive provisions. Ten of the eleven substantive sections went into effect in full on November 1, 2007. Parts of Section Seven of the Act do not go into effect until July 1, 2008. The eleven sections are now scattered throughout various titles of the Oklahoma Code, separate and distinct laws sharing little more than a common reason for enactment:

- What was known as "Section Three" of the Act is now codified as Okla. Stat. tit. 21, § 446. Section 446 creates criminal sanctions for certain instances of transporting, concealing, harboring or sheltering an illegal alien.

- "Section Four" of the Act is now codified as Okla. Stat. tit. 21, § 1550.42. Section 1550.42 regulates who may create identification documents and limits the issuance of certain types of such documents to United State citizens, nationals, and legal permanent resident aliens.

- "Section Five" of the Act is now codified as Okla. Stat. tit. 22, § 171.2. Section 171.2 creates a rebuttable presumption that a person who has been determined to be an illegal alien is a flight risk for purposes of the issuance of bail.

- "Section Six" of the Act is now codified as Okla. Stat. tit. 25, § 1312. Section 1312 simply defines some of the terms contained within "Section Seven" of the Act.

- "Section Seven" of the Act is now codified as Okla. Stat. tit. 25, § 1313. Section 1313 requires public employers to use a Status Verification System to verify the federal employment authorization status of all new employees. After July 1, 2008, § 1313 will prohibit public employers who do not use a Status Verification System from entering into any contracts with the state. Section 1313 will also allow United States citizens who are discharged from their job to sue their employer, if the employer has on their payroll an illegal alien hired after July 1, 2008. Employers who participate in a Status Verification System are immune from any suit arising out of § 1313.

- "Section Eight" of the Act is now codified as Okla. Stat. tit. 56, § 71. Section 71 requires every state agency to verify the citizenship status of anyone applying for most types of state, local, or federal benefits administered by the agency. Applicants for benefits must verify their legal status by executing an affidavit attesting to their lawful presence in the United States.

- "Section Nine" of the Act is now codified as Okla. Stat. tit. 68, § 2385.32. Section 2385.32 requires those contracting with individual independent contractors to withhold state income taxes at the top marginal rate if the individual independent contractor fails to provide documentation of his or her lawful presence in the United States.

- "Section Ten" of the Act is now codified as Okla. Stat. tit. 74, § 20j. Section 20j authorizes and directs the Attorney General of Oklahoma to negotiate a memorandum of understanding between the State of Oklahoma and the United States Department of Justice or the United States Department of Homeland Security. The memorandum would deal with the enforcement of federal immigration and customs laws, detention and removals, and investigations in the State of Oklahoma. Section 20j(E) also prohibits persons and agencies from prohibiting, or in any way restricting, the exchange or maintenance of information regarding the legal status of any individual. Section 20j also creates a private cause of action by any legal person lawfully domiciled in the state to file for a writ of mandamus compelling any non-cooperating local or state governmental agency to comply with § 20j(E).

- "Section Eleven" of the Act is now codified as Okla. Stat. tit. 70, § 3242.2. Section 3242.2 makes most illegal aliens ineligible for any post-secondary educational benefit, including scholarships, financial aid, and resident tuition.

- "Section Twelve" of the Act is now codified as Okla. Stat. tit. 74, § 151.2. Section 151.2 creates a state Fraudulent Documents Identification Unit as part of the Department of Public Safety.

- "Section Thirteen" of the Act is now codified as Okla. Stat. tit. 70, § 3242. Section 3242 simply sets forth standards for determining the eligibility for post-secondary educational benefits.

**B. Procedural Background**

A group of plaintiffs filed a lawsuit challenging the constitutionality of the Act on October 15, 2007 (Case No. CIV-07-594). Those plaintiffs sought a declaration of unconstitutionality as well

as a permanent injunction enjoining the enforcement of the Act. In an October 22, 2007 order, the Court addressed the concerns it had over the broad nature of the plaintiffs' complaint:

> While a constitutional vetting of HB 1804 would serve the interest of all parties to this litigation, the interest of the public would best be served by a sharpening of the issues presented prior to such a vetting. Such a sharpening can only be achieved through a suit brought by Plaintiffs with well-defined injuries causally connected to HB 1804.

*National Coalition of Latino Clergy, Inc. v. Henry*, No. CIV-07-594, slip op. at 11 (N.D.Okla. October 22, 2007). The Court was convinced that by narrowing the issues, and by limiting the pool of plaintiffs to those who had actually been injured by the Act, the more troublesome provisions of the Act could receive the vigorous and focused constitutional scrutiny that the law demands. Unfortunately, that constitutional scrutiny was rendered impossible by the plaintiffs' failure to establish standing in their complaint, and the Court dismissed the suit *sua sponte*, holding that the plaintiffs lacked Article III standing.

Plaintiffs filed the present lawsuit on October 25, 2007, once again challenging the constitutionality of the Act, as well as the constitutionality of five other state statutes relating to the issuance and renewal of driver's licenses. Plaintiffs' complaint[2] is breathtakingly broad. By the Court's count, the seventy-six page complaint attempts to challenge sixteen separate statutes, under twenty-one different state and federal constitutional provisions and statutes, and on behalf of eighteen different plaintiffs. The complaint seeks declaratory and permanent injunctive relief, and also sought a preliminary injunction in order to stop the Act from going into effect on November 1, 2007. The Court heard argument on the preliminary injunction at an October 31, 2007 hearing, and

---

[2] Plaintiffs amended their complaint on October 31, 2007, and it is to this amended complaint that the Court refers.

subsequently denied the preliminary injunction, holding that Plaintiffs had failed to establish their right to a preliminary injunction.

On November 6, 2007, the Defendants filed the instant Motion to Dismiss the amended complaint. Defendants seek dismissal of the suit on four separate grounds. Defendants allege that: (1) the Plaintiffs have failed to state claims upon which relief can be granted; (2) the Governor and the Attorney General are improper parties; (3) Plaintiffs lack standing; and (4) the Court should abstain from hearing the lawsuit. Plaintiffs contest each claim made by the Defendants and ask the Court to deny the motion. The Court addresses standing first.

## DISCUSSION

### A. Standing

Standing is the threshold question in every federal case, and determines the court's power to entertain the dispute. *Warth v. Seldin*, 422 U.S. 490, 498 (1975). In cases of this nature, where Plaintiffs are asking the Court to invoke Article III powers to inject itself into the workings of the executive branch, the necessity of standing is of particular importance. *State of Utah v. Babbitt,* 137 F.3d 1193, 1202 (10th Cir. 1998).

The Supreme Court has established that the "irreducible constitutional minimum of standing" contains three elements: (1) the plaintiff must have suffered an "injury in fact," a concrete and particularized invasion of a legally protected interest which is actual or imminent, not conjectural or hypothetical; (2) there must be a causal connection between the injury and the conduct complained of; and (3) it must be likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992) (internal quotations omitted).

While the Supreme Court has recognized that a plaintiff "does not have to await the consummation of threatened injury to obtain preventative relief," *Pennsylvania v. West Virginia*, 262 U.S. 553, 593 (1923), a plaintiff seeking preventative relief is not relieved of their burden of establishing an "injury in fact" under *Lujan*'s first prong. The Court has consistently maintained that the "federal judicial power is to be exercised...only at the instance of one who is himself immediately harmed, or *immediately threatened with harm*, by the challenged action." *Poe v. Ullman*, 367 U.S. 497, 504 (1961) (emphasis added). *Lujan* is instructive as to what constitutes such "immediate" harm and the lesson of *Lujan* is clear: mere allegations that at some point in the future an injury might occur are not enough to establish standing. What is required is a more particularized allegation showing that an injury *will* occur at a certain time in the future.

With those standards in mind, the Court examines each Plaintiff to determine whether they have standing to challenge any of the state statutes in question.

### 1. CONLAMIC-USA and CONLAMIC-Oklahoma

CONLAMIC-USA is an association of Latino clergymen. CONLAMIC-USA alleges no injury on the part of the association, but instead alleges that individual members of the association have been injured by Okla. Stat. tit. 21, § 446. The Supreme Court has long recognized that an association has standing to sue on behalf of its members when: "(a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." *Hunt v. Washington State Apple Adver. Comm'n*, 432 U.S. 333, 343 (1977). The Court is satisfied that the second and third prongs of the

three-pronged *Hunt* test are satisfied here. The Court's analysis, therefore, focuses on whether any of CONLAMIC-USA's individual members have standing.

CONLAMIC-USA alleges that it has thirty pastor members in Tulsa County. Further, CONLAMIC-USA asserts these pastors transport illegal aliens as part of their church work and, as a result, fear prosecution under Okla. Stat. tit. 21, § 446. As individuals, these pastors could be subject to prosecution under section 446 should state law enforcement agencies decide that the transportation of church members falls within the letter and spirit of § 446.

The Court, however, is concerned with the lack of specificity in CONLAMIC-USA's assertion that "30 pastors in Tulsa County [a]re members of CONLAMIC."[3] Such a lack of specificity makes it impossible for the Court to determine whether any individual member of CONLAMIC-USA has standing. Although this is an easily curable defect, the Court cannot find associational standing on the part of CONLAMIC-USA unless CONLAMIC-USA *identifies* an individual member pastor that would have standing to sue.[4]

Because CONLAMIC-USA has failed to identify an individual member that would have standing to sue, CONLAMIC-USA does not have standing to sue as an association. Therefore, CONLAMIC-USA is dismissed from the suit for lack of standing. CONLAMIC-Oklahoma is simply the Oklahoma branch of CONLAMIC-USA. Having found that CONLAMIC-USA lacks standing to challenge Okla. Stat. tit. 21, § 446, CONLAMIC-Oklahoma similarly lacks standing.

---

[3]The Complaint does identify one pastor by name, a pastor "Julian Rodriguez." (Compl. ¶ 21.) But Pastor Julian is never identified as a member of CONLAMIC-USA.

[4]Merriam-Webster defines "identify" as "to establish the identity of." Webster's Third New International Dictionary 1123 (Philip Babcock Gove, Ph.D. ed., 2002).

7

### 2. Church Eficaz and Church Piedra Angular

Church Eficaz and Church Piedra Angular each alleges fear of criminal prosecution under Okla. Stat. tit. 21, § 446 because of the Churches' transport of illegal alien church members. The Churches' fear is wholly unfounded. Only "persons," not entities like the Churches, are subject to criminal prosecution under § 446. Because the Churches can not be prosecuted under § 446, they have no standing to challenge that law.

Church Piedra Angular also alleges injury based on its status as an employer. The Church alleges Okla. Stat. tit. 25, § 1313 requires "burdensome and time consuming" participation in a Status Verification System to assure insulation from legal action. However, § 1313 does not become effective until after July 1, 2008:

> It shall be a discriminatory practice for an employing entity to discharge an employee working in Oklahoma who is a United States citizen or permanent resident alien while retaining an employee who the employing entity knows, or reasonably should have known, is an unauthorized alien *hired after July 1, 2008*, and who is working in Oklahoma in a job category that requires equal skill, effort, and responsibility, and which is performed under similar working conditions, as defined by 29 U.S.C., Section 206(d)(1), as the job category held by the discharged employee.

Okla. Stat. tit. 25, § 1313 (emphasis added). Although the Church claims that "participation in a Status verification system after November 1, 2007 is necessitated by [the statute]," that is simply not the case. (Compl. ¶ 33.) As the statute makes clear, a cause of action only arises after July 1, 2008, and even then only applies to employers who have hired an illegal alien after that date. Therefore, the Church derives no benefit from use of a Status Verification System until July 1, 2008, and thus cannot claim that § 1313 somehow necessitated its use of such a system beginning November 1, 2007.

8

As a result, the injury alleged by Church Piedra Angular is both too speculative and non-imminent to provide standing. Church Piedra Angular asks this Court to look seven months into the future, presume that the Church will hire an illegal alien, fire a United States citizen, retain the illegal alien, and then be sued by a United States citizen. This alleged injury is not the "imminent" injury envisioned by the *Lujan* court. Therefore, Church Piedra Angular has no standing to challenge § 1313.

Because Church Eficaz only challenges § 446, and the Court has found it lacks standing to challenge that statute, Church Eficaz is dismissed from the suit for lack of standing. Because Church Piedra Angular only challenges § 446 and § 1313, and the Court has found it lacks standing to challenge both statutes, Church Piedra Angular is dismissed from the suit for lack of standing.

### 3. T-Mac Construction, Inc. and Chilino's Restaurant

T-Mac Construction and Chilino's Restaurant, like Church Piedra Angular, claim that Okla. Stat. tit. 25, § 1313 injures them by requiring the "burdensome and time consuming" act of participating in a Status Verification System. For the same reasons as articulated above, this alleged injury is both too speculative and non-imminent to provide standing. Therefore, neither T-Mac Construction nor Chilino's Restaurant have standing to challenge § 1313.

T-Mac Construction also claims that it owns four rental properties and "[b]ecause of HB 1804, Plaintiff T-Mac Construction, Inc. will no longer rent the properties to undocumented aliens." T-Mac does not explain how any section of HB 1804 prevents it from renting to undocumented aliens. Presumably T-Mac fears criminal prosecution under Okla. Stat. tit. 21, § 446, but like the Church Plaintiffs, that fear is unfounded. Only "persons," and not corporate entities such as a T-

9

Mac, are subject to criminal prosecution under § 446. Therefore, T-Mac Construction has no standing to challenge Okla. Stat. tit. 21, § 446.

Because Chilino's Restaurant only challenges § 1313, and the Court has found it lacks standing to challenge that statute, Chilino's is dismissed from the suit for lack of standing. Because T-Mac Construction only challenges § 1313 and § 446, and the Court has found it lacks standing to challenge both statutes, T-Mac is dismissed from the suit for lack of standing.

### 4. The Individual Plaintiffs

Plaintiffs' complaint alleges a singly injury to the individual plaintiffs as a whole (the John and Jane Does collectively). The individual Plaintiffs allege that "if, after November 1, 2007, they are arrested for violation of Section 3 of HB 1804, a felony, they will be denied bail pursuant to Section 5 of HB 1804." (Compl. ¶ 81.) The individual Plaintiffs, therefore, ask this Court to presume that they will engage in criminal activity, be arrested, prosecuted, and denied bail by a judge relying on Okla. Stat. tit. 22, § 171.2. The Court cannot engage in such presumptions. This alleged injury is strikingly speculative and cannot sustain standing. *See O'Shea v. Littleton*, 414 U.S. 488 (1974) (discriminatory bail practices challenged; no standing because possibility that plaintiffs—none of whom had been subject to the discriminatory bail practices—would later violate law was too remote). The Court therefore finds that no individual plaintiff has standing to challenge Okla. Stat. tit. 22, § 171.2.

### 5. John Doe Two

John Doe Two, an illegal alien, alleges no unique injuries as a result of any state statute. (See Compl. ¶¶ 56-58.) Therefore, he has no standing to sue and is dismissed from this action.

### 6. John Does Three, Four, Five, Six, and Seven and Jane Does Two, Three, Four, and Five

These illegal alien John and Jane Doe Plaintiffs each allege that they have either been evicted or threatened with eviction from their rental properties because of Okla. Stat. tit. 21, § 446. These Plaintiffs allege that their landlords fear that continuing to rent to these illegal aliens would subject the landlords to prosecution under § 446. The Court is satisfied that the loss, or imminent loss, of one's apartment or rental house is an actual or concrete injury, and the allegation that this injury was caused by § 446 is enough to survive a constitutional standing analysis at the motion to dismiss stage. Because each of these John and Jane Does have alleged concrete injury caused by § 446, they have Article III standing to challenge its constitutionality.

### 7. Jane Doe One

Jane Doe One, an illegal alien, alleges that her license will expire in March 2008. She claims that Okla. Stat. tit. 21, § 1550.42 and Okla. Stat. tit. 47, §§ 6-115 and 6-122 will prevent her license from being renewed. While § 1550.42 and § 6-115 govern an illegal aliens ability to obtain a driver's license, § 6-122 simply says that aliens may not renew their licenses by mail. Jane Doe One makes no allegation that she intends to renew her license by mail. In order to have standing to challenge § 6-122, Jane Doe One must show how that statute has injured or threatens to injure her. While the Court is satisfied that the injury Jane Doe One alleges will be caused by § 1550.42 and § 6-115 in March 2008 is imminent enough to provide standing, the Court is not satisfied that Jane Doe One has properly alleged any injury as a result of § 6-122.

Because Jane Doe Two has properly alleged threatened injury as a result of Okla. Stat. tit. 21 § 1550.42 and Okla. Stat. tit. 47 § 6-115, she has standing to challenge those two statutes. Jane Doe Two does not have standing to challenge Okla. Stat. tit. 47 § 6-122.

**8. John Doe One**

John Doe One, an illegal alien, alleges that Okla. Stat. tit. 47, § 6-103(A)(9) caused him to be denied an Oklahoma driver's license. Section 6-103(A)(9) forbids the Department of Public safety from issuing driver's licenses to illegal aliens. By alleging that this statute was the cause of the denial of his license, John Doe One has properly alleged a concrete injury and has Article III standing to challenge its constitutionality.

**9. Conclusion**

After examining each Plaintiff's claims, the Court has determined that the following Plaintiffs have Article III standing to challenge the following statutes:

- John Doe One, challenging Okla. Stat. tit. 47 § 6-103(A)(9);
- John Doe Three, challenging Okla. Stat. tit. 21 § 446;
- John Doe Four, challenging Okla. Stat. tit. 21 § 446;
- John Doe Five, challenging Okla. Stat. tit. 21 § 446;
- John Doe Six, challenging Okla. Stat. tit. 21 § 446;
- John Doe Seven, challenging Okla. Stat. tit. 21 § 446;
- Jane Doe One, challenging Okla. Stat. tit. 21 § 1550.42 and Okla. Stat. tit. 47 §§ 6-115;
- Jane Doe Two, challenging Okla. Stat. tit. 21 § 446;
- Jane Doe Three, challenging Okla. Stat. tit. 21 § 446;
- Jane Doe Four, challenging Okla. Stat. tit. 21 § 446;
- and Jane Doe Five, challenging Okla. Stat. tit. 21 § 446.

The following Plaintiffs are dismissed from the case for lack of Article III standing:

- CONLAMIC-USA;
- CONLAMIC-Oklahoma;
- Church Eficaz;
- Church Piedra Angular;
- T-Mac Construction;
- Chilino's Restaurant;
- and John Doe Two.

The Court's standing analysis does not end here. Standing jurisprudence "contains two strands: Article III standing, which enforces the Constitution's case-or-controversy requirement,

...and prudential standing, which embodies judicially self-imposed limits on the exercise of federal jurisdiction." *Elk Grove Unified School Dist. v. Newdow*, 542 U.S. 1, 11-12 (2004) (citations omitted)(quotations omitted). Having determined that the remaining Plaintiffs have Article III standing, the Court must now examine whether any prudential grounds exist for denying standing.

**B. Prudential Limitations on Standing**

Standing's two strands revolve around a common theme: "the focus is on the party, not the claim itself." 13 Charles A. Wright, Arthur R. Miller & Edward H. Cooper, Federal Practice & Procedure § 3531, at 338 (Supp.2007). The prudential strand of the standing doctrine is the recognition that sometimes courts must refuse to hear claims brought by litigants who are not properly situated. *Id.*

The Supreme Court has recognized that prudential standing encompasses, "the general prohibition on a litigant's raising another person's legal rights, the rule barring adjudication of generalized grievances more appropriately addressed in the representative branches, and the requirement that a plaintiff's complaint fall within the zone of interests protected by the law invoked." *Allen v. Wright,* 468 U.S. 737, 751 (1984). However, the Court has also recognized that such self-imposed limits might need to be imposed in unique cases, therefore, the Court has declined to "exhaustively defin[e] the prudential dimensions of the standing doctrine." *Elk Grove Unified School Dist. v. Newdow*, 542 U.S. 1, 12 (2004).

Indeed, *Elk Grove* illustrates the Supreme Court's recent willingness to invoke prudential standing in cases falling outside of the three categories articulated in *Allen*. In *Elk Grove*, the Court held that "it is improper for [a] federal cour[t] to entertain a claim by a plaintiff whose standing to sue is founded on family law rights that are in dispute when prosecution of the lawsuit may have an

13

adverse effect on the person who is the source of the plaintiff's claimed standing." *Elk Grove Unified School Dist. v. Newdow*, 542 U.S. at 17. Factually, the case involved an atheist father bringing suit against his daughter's school district because the school district required each elementary school class to recite the Pledge of Allegiance each morning. The child's mother—who was divorced from the plaintiff father—filed a motion to intervene or dismiss claiming that she had exclusive legal custody under a state court order and that, as her daughter's sole legal custodian, she felt it was not in the child's interest to be a party to the father's suit. *Id.* at 1. The Court made no attempt to shoehorn the case into one of the three previously recognized categories of prudential standing. Instead, the Court reasoned that its long recognized unwillingness to hear domestic relations cases, and unwillingness to hear cases involving "difficult questions of state law bearing on policy problems of substantial public import whose importance transcends the result in the case then at bar," made it appropriate for it to prudentially decline to recognize standing on the part of the plaintiff father.[5] *Id.* at 12-13 (citing *Ankenbrandt v. Richards*, 504 U.S. 689, 703 (1992); and *Colorado River Water Conservation Dist. v. United States*, 424 U.S. 800, 814 (1976)). As the Court noted, "when matters of great national significance are at stake," federal courts must "guard jealously and exercise rarely [their] power to make constitutional pronouncements." *Id.* at 12.

While the case now before the Court similarly does not fall into one of the three categories articulated in *Allen*, the Court is nonetheless persuaded that the present case involves the type of unique facts that led the *Elk Grove* Court to recognize that not all prudential limitations on standing

---

[5]The *Elk Grove* Court's invocation of the "domestic relations exception," and the abstention doctrine of *Colorado River,* highlight just how intertwined those discretionary doctrines are with prudential standing. In fact, it is difficult to distinguish the abstention doctrines, from the prudential standing doctrines, from the equitable doctrines of laches and unclean hands. However courts might clothe the idea, the end result is the same: a federal court declining to entertain a suit it is otherwise free to adjudicate.

14

would fall into such neat categories. This Court is convinced that the proper remedy for the injuries alleged by the remaining Plaintiffs—all of whom are in willing violation of federal immigration law—is not judicial intervention, rather, it is simple compliance with federal immigration law. Therefore, the Court must prudentially decline to recognize standing on the part of these plaintiffs. In reaching this conclusion, the Court recognizes that illegal aliens have been deemed to be clothed with the protections of certain Constitutional rights. *See Plyler v. Doe*, 457 U.S. 202 (1982) (extending protections of Fourteenth Amendment's Equal Protection Clause to illegal alien children). The Court's focus, however, is not on the illegal alien Plaintiffs' claims—nor the rights underlying those claims—it is on the Plaintiffs themselves.

In focusing on the illegal alien Plaintiffs here, the Court is reminded that courts have customarily declined to entertain cases involving plaintiffs with "unclean hands." *Precision Instrument Mfg. Co. v. Automotive Maintenance Machinery Co.,* 324 U.S. 806, 814 (1945). This equitable maxim—that "he who comes into equity must come with clean hands"—is a judicial closing of the courthouse doors to those tainted with inequitableness or bad faith related to the matter in which they now seek relief. *Id.* In the present case, the Court is deeply concerned by the implications of the illegal Plaintiffs' admission of violations of federal immigration laws.[6] These Plaintiffs admit their violation of federal law, and then ask this Court to allow them to file suit *anonymously*, so as to avoid detection by the federal law enforcement agencies tasked with investigating immigration violations. Additionally, the illegal alien Plaintiffs make no attempt to

---

[6]The underlying illegality here — the admitted violations of federal immigration law — is *directly,* even *causally,* related to the injuries the illegal alien Plaintiffs ask this Court to remedy. A wholly different situation is presented by, for example, an illegal alien negligently injured in a car accident. In that case, the illegal alien plaintiff could certainly bring suit to recover for their injuries because their illegal presence in this country is in no way related to their negligence cause of action. Similarly, an illegal alien criminal defendant deprived of certain due process rights could certainly challenge that deprivation because the injury in that case would be unrelated to the defendant's status as an illegal alien.

validate their unlawful presence in this country. Indeed, curiously absent from their voluminous complaint is any challenge to the federal laws rendering their presence in this country illegal.[7] Instead, these Plaintiffs seemingly concede the validity of the federal immigration laws, and file this suit in order to remove any barriers the state of Oklahoma has erected to their continued violation of those federal laws. These illegal alien Plaintiffs seek nothing more than to use this Court as a vehicle for their continued unlawful presence in this country. To allow these Plaintiffs to do so would make this Court an "abetter of iniquity" and this Court finds that simply unpalatable.[8] *See id.*

The Court would perhaps reach a different conclusion if this case involved children plaintiffs whose unlawful presence in this country was involuntary. *See Plyler,* 457 U.S. at 220. Indeed, the *Plyler* Court made it clear that the result in that case was predicated, in large part, on the fact that the illegal alien children plaintiffs' unlawful presence in the country was not of their own volition:

> At the least, those who elect to enter our territory by stealth and in violation of our law should be prepared to bear the consequences, including, but not limited to, deportation. But the children of those illegal entrants are not comparably situated. Their parents have the ability to conform their conduct to societal norms, and presumably the ability to remove themselves from the State's jurisdiction; but the children who are plaintiffs in these cases can affect neither their parents' conduct nor their own status.

---

[7] This would perhaps be a different case if the illegal alien Plaintiffs were in fact challenging their underlying immigration status. Such a challenge would at least show a good faith effort to conform with federal law.

[8] While the situation here is vastly more benign, the Court can envision a scenario where a foreign member and supporter of a known terrorist organization could enter the country illegally, make their way to Oklahoma, anonymously—to avoid arrest by federal authorities—file a lawsuit challenging the constitutionality of Okla. Stat. tit. 21, § 1268, *et. seq.* (the "Oklahoma Antiterrorism Act"), admit in their lawsuit that they are in violation of multiple federal anti-terrorism statutes, and expect this Court to entertain their challenge to the state anti-terrorism law designed to bolster the federal law. Surely this Court would not be required to allow *that* anonymous Plaintiff to bring suit.

*Id.* (quotations omitted). The illegal alien Plaintiffs in the present case, like the parents in *Plyler,* have chosen to enter and remain in this country in violation of federal law. For these Plaintiffs, the remedy for their alleged injuries is simple: *act in accordance with federal law*.[9]

The Court, therefore, recognizes a new, and narrow, prudential limitation on standing. An illegal alien, in willful violation of federal immigration law, is without standing to challenge the constitutionality of a state law, when compliance with federal law would absolve the illegal alien's constitutional dilemma—particularly when the challenged state law was enacted to discourage violation of the federal immigration law. In recognizing this narrow prudential limitation on standing, the Court does not shirk its responsibility to pass on the constitutionality of a law when properly called to do so, the Court just requires that the call come from a plaintiff not in unabashed violation of federal law.

## **CONCLUSION**

The Court is again confronted with plaintiffs bringing a broad array of constitutional and statutory challenges to a similarly broad array of state statutes. Again, some Plaintiffs ignore the need to describe the injuries actually caused by the challenged statutes, while the illegal alien Plaintiffs complain of grievances that could best be remedied by simply compliance with federal law. Both categories of Plaintiffs must be dismissed for lack of standing, either on constitutional or prudential grounds.

The delicate balance of powers between the three branches of our federal government demands the Court engage in a rigorous standing analysis. The law of standing creates a check on

---

[9] It is also important to note that this holding does not render the Oklahoma laws immune from challenge. Several of the non-illegal alien Plaintiffs lacking *constitutional* standing lack such standing because of easily curable defects in the pleadings. A well-pled complaint is all that is needed to cure those defects, thus allowing the challenge to move forward with plaintiffs not in violation of federal law.

the power of the judiciary that is essential to the maintenance of that balance of powers. Issues involved in this case clearly highlight the need to revisit the concept of separation of powers. Not only are Plaintiffs asking this Court to become involved in matters reserved for the state of Oklahoma's executive branch, the statutes these Plaintiffs ask the Court to enjoin received overwhelming bi-partisan support from the popularly elected Oklahoma state legislature. The Court recognizes that popular support does not render a law constitutional, nor does it relieve the Court of its duty to examine a law's constitutionality, but popular support does make this Court particularly sensitive to the fact that its duty to examine a law's constitutionality arises *only after the law of standing is satisfied*. Cognizant of this, the Court is reminded: "All of the doctrines that cluster about Article III, [r]elate in part, and in different though overlapping ways, to an idea, which is more than an intuition but less than a rigorous and explicit theory, about the constitutional and prudential limits to the powers of an unelected, unrepresentative judiciary in our kind of government." *Vander Jagt v. O'Neill*, 699 F.2d 1166, 1178-79 (D.C.Cir.1983) (Bork, J., concurring)). That "idea" is exactly why Article III of the United States Constitution does not give litigants an absolute right to have their claims heard by a federal court, and that "idea" is why this Court rigorously adheres to the law of standing.

For the reasons set forth above, all Plaintiffs are dismissed for lack of standing. Defendants' Motion to Dismiss is therefore GRANTED.

IT IS SO ORDERED.

James H. Payne
United States District Judge
Northern District of Oklahoma